| | |
|---|---|
| CW-1 | Sure. |
| T. BLAKE | [inaudible] He—he was great. So I've effectively, you know, evaded both, you know, answering anything there. So we're good. |
| CW-1 | Okay, well, again on our side, from my side I just want to make sure because the, you know, I'm not going to tell the IRS that essentially we did this [for your daughter] and-- and it was, it was [your daughter] getting in through Donna Heinel and women's volleyball. |
| T. BLAKE | Right. |
| CW-1 | [inaudible] payment and that was the payment. |
| T. BLAKE | Mm-hmm. |

447.  In the call, TODD BLAKE also acknowledged that his daughter was not a legitimate volleyball recruit:

| | |
|---|---|
| CW-1 | [Inaudible] what I was going to say was the funny thing is, Donna calls me and says, "Hey, [CW-1], that profile you did for [the BLAKES' daughter] was awesome so any, woman, girl that you have that is going to come in--" |
| T. BLAKE | Oh good. |
| CW-1 | "--the same way, that isn't good enough to play volleyball here--" |
| T. BLAKE | Right. |
| CW-1 | "--and you're going to make a payment for--" |
| T. BLAKE | Mm-hmm. |
| CW-1 | "--follow that same profile that you did for [the BLAKES' daughter]." |
| T. BLAKE | Oh, good.  So did she get audited as well? |
| CW-1 | No, no, I'm g-- I'm the [one getting] audited, I'm getting audited. |
| T. BLAKE | Okay. |
| CW-1 | Nobody else is getting audited. |

448.    Finally, TODD BLAKE asked CW-1 what he should say in the event that the IRS called him to discuss the payments.

| T. BLAKE | And will I get contacted, and if so how would you like me to answer? |
| CW-1 | Great, that's perfect, so what I want you to say is that your money went to our foundation, which it did. |
| T. BLAKE | Yeah. Okay. |
| CW-1 | And it helped underserved kids. |
| T. BLAKE | Yeah. |
| CW-1 | You made a donation to help underserved kids. |
| T. BLAKE | Right. Okay, good. |
| CW-1 | All good? |
| T. BLAKE | Yeah, sounds great. |

449.    In a call on or about February 22, 2019, CW-1, at the instruction of law enforcement agents, told DIANE BLAKE that USC had received a subpoena for athletic records for the past 12 years. The following is an excerpt from the conversation, which was consensually recorded.

| CW-1 | So, so USC, they were subpoenaed for all athletes' records for the past 12 years. That's a lot of kids. |
| D. BLAKE | Yeah. |
| CW-1 | Okay. So my contacts at USC called me kind of to give me a heads up. And since [your daughter] was accepted through volleyball, but wasn't really a volleyball player in reality at [the] USC level-- |
| D. BLAKE | Yeah. |
| CW-1 | --I just wanted you to know that they-- I mean it could be absolutely nothing, because it's thous-- you know, it's a lot of folks. But [your daughter] is one of those that got in with you guys making a payment. You |

know the 50,000 to USC women's athletics directly, and then 200 to my
foundation.

D. BLAKE          Right.

CW-1              That was payment to get her in.

D. BLAKE          Right.

CW-1              So I just wanted you to know that if they ask for the records--

D. BLAKE          Oh my god.

CW-1              --don't know if anything is gonna ever come about it but I just wanna
                  make sure everybody is aware.

D. BLAKE          So what does that mean?

CW-1              I think that they're the-- whoever it is that subpoenaed the records is
                  looking at, kind of, all the athletes and how the process works and what
                  happens over-- but it's, you know, it's a long time. So I have, I have no
                  idea to be frank with you. They just told me, "Hey, just a heads up you
                  have a lot of kids that went through the side door here.  Just want you to
                  be aware of it." That's all. It may be nothing, who knows, so I just wanted
                  you to be aware.

D. BLAKE          Hmm. So, wow. Okay. Okay, gotcha. Like, should I be concerned?

CW-1              No, I don't think so. I mean, it's, it's a lot of years and a lot of kids and a
                  lot of sports.

D. BLAKE          Right.

CW-1              So it may not have anything to do with anything. I just-- I, I just wanted to
                  make sure that everybody is aware.

D. BLAKE          Okay. Like [inaudible]

CW-1              Okay.

D. BLAKE          --in case we got a call or something?

CW-1              Yes. Yeah.

D. BLAKE          Okay.

| CW-1 | Which I doubt. |
| D. BLAKE | Okay. Well I will let you know if we do of course. |
| CW-1 | Okay. |
| D. BLAKE | Yikes. Right. I mean, [our daughter] doesn't even know, you know? |
| CW-1 | No. No, I know that. |

### U.  PETER JAN "P.J." SARTORIO

450.    Defendant PETER JAN "P.J." SARTORIO is a resident of Menlo Park, California.  SARTORIO is a packaged food entrepreneur.

451.    As set forth below, SARTORIO agreed to participate in the college entrance exam cheating scheme by paying CW-1 $15,000 in cash in or about June 2017 to have CW-2 purport to proctor the ACT for SARTORIO's daughter, and correct her exam answers.

452.    On or about May 8, 2017, ACT, Inc. notified SARTORIO's spouse via e-mail that SARTORIO's daughter had been approved for extended time on the ACT exam.  SARTORIO's spouse forwarded the notification to SARTORIO, CW-1 and Sanford, noting, "Yay, she was approved!"

453.    On or about May 18, 2017, CW-1 forwarded SARTORIO's daughter's ACT information to Dvorskiy, writing, "New student."  Dvorskiy responded by attaching a completed form requesting that SARTORIO's daughter be permitted to take the ACT at the West Hollywood Test Center instead of at her own high school.  ACT, Inc. authorized the move on or about May 31, 2017.

454.    CW-2 flew from Tampa to Los Angeles on or about June 9, 2017—the day before SARTORIO's daughter took the ACT exam at the West Hollywood Test Center.  CW-2 returned to Tampa on or about June 11, 2017, the day after the exam.

455.    On or about June 12, 2017, CW-1 caused KWF to issue a check in the amount of

$15,600 to CW-2, representing payments for the ACT exams that CW-2 purported to proctor for

SARTORIO's daughter and the ISACKSONS' daughter (discussed above).

456.    As noted, SARTORIO paid CW-1 $15,000 in cash for the ACT scheme.  Bank

records indicate that SARTORIO withdrew a total of $15,000 in cash in three separate

transactions between on or about June 16, 2017 and on or about June 20, 2017.

457.    SARTORIO'S daughter received a score of 27 out of a possible 36 on the ACT,

which placed her in approximately the 86th percentile.  Although she had not previously taken

the ACT, she had previously earned scores of 900 and 960 out of a possible 1600 in successive

administrations of the PSAT, which placed her between the 42nd and 51st percentile for her

grade level.

458.    On or about October 25, 2018, CW-1 answered a call from SARTORIO at the

direction of law enforcement agents, and told him that KWF was being audited by the IRS.  The

following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So let me just-- the reason why I was calling you is because-- I'm in Boston. And one, I wanted to check in on [your daughter]. And then the other thing I wanted to let you know is, which is so typical, so my foundation is getting audited now-- which is, as you know, pretty natural. |
| SARTORIO | Yeah? |
| CW-1 | So they're looking at all my payments, everything that's come into our group, and all of those kinds of things. So I just wanted to make you aware, but, y-- 'cause they're asking about everything that-- every family that was involved with us, every payment that's ever come to us, all that kinda stuff.  So one of the big things is that, you know, because [CW-2] took the test for [your daughter], I just want to make sure that-- when the IRS talks to me about, you know, what's happened with [your daughter] and the Sartorios, I'm not gonna say anything about [CW-2] taking the test for [her]. I'm essentially going to just say that monies that came in to us just went in to us to take care of you know, all the normal fees -- |

SARTORIO    Uh—

CW-1        --that occur for taking care of families. Because, of course, you guys--

SARTORIO    Uh—

CW-1        --you won't show up on my books, because you paid cash, essentially, for
            her to take the test with [CW-2].

SARTORIO    Right.

CW-1        So that doesn't show up.  Right?

SARTORIO    Right.

CW-1        Right.  So I-- all I want you to do is just-- 'Cause I could see, at some
            point, they're gonna call some families. And I just wanted to make sure
            that I remind you tha--

SARTORIO    Oh-- oh, yeah. You do-- no. No, no. Yeah. I shouldn't say-- Absolutely.
            Believe me. There would be no-- there would be no mention of that.
            'Cause that's never happened. There's no record of-- All I know is I-- I-- I
            paid bills that were sent to me, invoiced.

CW-1        Uh--

SARTORIO    Those were paid.

CW-1        Uh--

SARTORIO    That's all I know. That's all we did. And [my daughter] took a test. And
            that's all I know. I don't know of anything else. So.

CW-1        Okay. Well, again-- and obviously, because you paid in cash, we do-- there
            was n-- you didn't take a write-off of that. So--

SARTORIO    No.

CW-1        Okay. Okay.  Again, I just want to make sure that our stories are correct.
            Because it's some--

SARTORIO    There is no-- no-- there is no record on my end like a 1040. There is
            nothing on my end that shows that your company, [CW-1], or anybody,
            received any cash payments. Only payments they could look at would be
            an invoiced amount or an actual check. And that's what w-- that was

already discussed. But anything that was done verbally, that was verbal and there's no record. There's nothing. There's nothing.

CW-1            Got it.

SARTORIO        [inaudible] Got it.

CW-1            Got it. Okay. I just-- I just wanted to touch bases with you. Because, you know, all the audit stuff is coming in. And I have no idea where they'll go or where they won't go, as you know.

SARTORIO        Yeah.

CW-1            So I just wanted to touch bases.

SARTORIO        Yeah. What-- what you-- what you do is up to you. I gave-- Yeah. There's no—no-- Yeah. We're good.

## V. TOBY MACFARLANE

459.    Defendant TOBY MACFARLANE is a resident of Del Mar, California. During the relevant period, MACFARLANE was a senior executive at a title insurance company.

460.    As discussed below, MACFARLANE participated in the college recruitment scheme by agreeing to use bribery to facilitate the admission of his daughter to USC as a purported soccer recruit and, later, his son as a purported basketball recruit.

461.    On or about October 3, 2013, CW-1 e-mailed MACFARLANE's daughter's high school transcript and SAT scores to Khosroshahin and Janke, writing, "1st of 2 players."

462.    On or about October 17, 2013, CW-1 caused KWF to wire $50,000 to a private soccer club controlled by Khosroshahin and Janke.

463.    On or about October 25, 2013, Janke e-mailed CW-1 requesting "a profile and list of current work in progress" for MACFARLANE's daughter because Janke needed "to turn in everything by Monday" for her to be presented to the USC subcommittee on athletic admissions on November 4, 2013. CW-1 sent Janke information on MACFARLANE's daughter's high

school courses as well as a soccer profile, which included a photo of MACFARLANE's daughter
playing soccer that MACFARLANE's spouse had previously sent to CW-1.

464.    MACFARLANE's daughter's USC application falsely indicated that she was,
among other things, a "US Club Soccer All American" in the 10th, 11th, and 12th grades.

465.    On or about September 17, 2013, CW-1 e-mailed MACFARLANE and his
daughter a draft application essay, which stated: "On the soccer or lacrosse field I am the one
who looks like a boy amongst girls with my hair tied up, arms sleeveless, and blood and bruises
from head to toe. My parents have a hard time attending my soccer matches because our
opponent's parents are always making rude remarks about that number 8 player who plays
without a care for her body or anyone else's on the field. It is true that I can be a bit intense out
there on the field."

466.    MACFARLANE's daughter was presented to the USC subcommittee for athletic
admissions on or about November 4, 2013, and formally admitted to USC the following spring,
with an admissions letter mailed to her on or about March 26, 2014.

467.    On or about April 14, 2014, in an e-mail addressed to MACFARLANE's daughter
but sent to MACFARLANE, the NCAA Eligibility Center noted that she needed to complete her
NCAA eligibility paperwork. MACFARLANE forwarded the e-mail to CW-1 the following
day, asking, "Is this something [my daughter] needs to do?" CW-1 responded to
MACFARLANE, "I believe we did it but I will check." CW-1 also forwarded the e-mail to
Masera, asking, "Have you contacted him about the 200k for [MACFARLANE's daughter] and
USC?"

468.    That same day, Masera sent MACFARLANE an e-mail with the subject line
"Placement Fees $200K," stating that he would be coordinating the placement fees for

MACFARLANE's daughter and asking how MACFARLANE would be transmitting the payment. On or about April 17, 2014, MACFARLANE sent CW-1 an e-mail with the subject line "Real Estate Consulting Invoice," asking CW-1 to "provide an invoice for the entire amount due." On or about May 2, 2014, MACFARLANE issued a $200,000 check to CW-1's for-profit entity, The Key, with "Real Estate Consulting & Analysis" written in the memo line. Approximately ten days later, on or about May 12, CW-1 caused The Key to issue a $100,000 payment to a private soccer club controlled by Khosroshahin and Janke.

469. In or about the summer of 2014, a USC athletics academic counselor e-mailed MACFARLANE's daughter regarding her fall 2014 class schedule, asking her to change her Friday classes because she would be missing most Fridays "due to travel or games." The e-mail was copied to the newly appointed head coach of women's soccer at USC. MACFARLANE's daughter forwarded the e-mail to MACFARLANE, asking whether she needed to respond. MACFARLANE forwarded the e-mail chain to CW-1, asking for his advice. CW-1 responded: "Has the program reached out to you to discuss anything yet? The new coaches have been on board for a while. If you speak to them let them know that [your daughter] has an injury - Plantar Fasciitis and will not be practicing or playing for a while[.]"

470. On or about August 15, 2014, the newly appointed head coach of women's soccer at USC responded to the e-mail from the academic counselor, noting, "[MACFARLANE's daughter] doesn't play for us." The coach then e-mailed MACFARLANE's daughter directly: "I'm sorry but I don't have you on my list of players. Could you contact me asap please." The coach also e-mailed a member of the USC athletics department that "[MACFARLANE's daughter] was on the list from the coaches, but I don't know who she is and [she] is not counted in my numbers."

471. MACFARLANE's daughter matriculated at USC in or about the fall of 2014 and graduated in 2018. She did not play soccer at USC.

472. On or about October 8, 2016, CW-1 made the following note in his phone: "[MACFARLANE's son] - USC 250 - 50 Donna[.]"

473. In an e-mail on or about November 15, 2016, CW-1 asked MACFARLANE's spouse for a photo of MACFARLANE's son playing basketball in his high school basketball uniform. MACFARLANE's spouse responded that she would take the photo and send it.

474. On or about November 27, 2016, CW-1 directed Janke to create a fabricated basketball profile for MACFARLANE's son. The basketball profile created by Janke falsely listed MACFARLANE's son's height as 6'1" and indicated that he played on his high school's varsity basketball team from 2014 through 2016. In fact, records from MACFARLANE's son's high school indicate that MACFARLANE's son did not play on the varsity basketball team until his senior year. And a personal statement for MACFARLANE's son, drafted by CW-1 but ultimately not submitted to USC, described how he knew that his height (5'5") would be a detriment to making his high school's varsity basketball team.

475. CW-1 e-mailed the athletic profile to Heinel, along with MACFARLANE's son's high school transcript and SAT scores, in or about December 2016. Heinel presented MACFARLANE's son to the USC subcommittee for athletic admissions on or about January 26, 2017.

476. On or about February 9, 2017, USC issued a letter to MACFARLANE's son, notifying him of his conditional admission to USC as a student athlete. The letter stated, "Your records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university."

477.    On or about February 13, 2017, MACFARLANE wrote a $50,000 check payable to USC Athletics. The memo line of the check reads, "[MACFARLANE's son] Women Athletic Board."

478.    USC issued a formal acceptance letter to MACFARLANE's son on or about March 23, 2017. On or about April 18, 2017, MACFARLANE paid CW-1 $200,000 via a check to the KWF charity. MACFARLANE wrote "Real Estate Consulting" in the memo line of the check.

479.    MACFARLANE's son attended USC briefly, but withdrew in or about May 2018. He did not play basketball at USC.

480.    On or about October 26, 2018, CW-1 called MACFARLANE at the direction of law enforcement agents and told him that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

CW-1            So, of course, my foundation is being audited now.

MACFARLANE     Okay.

CW-1            Because we have so many hundreds of, you know, folks who have made kind donations to our foundation so I wanted to make sure--

MACFARLANE     Yes.

CW-1            --that you were aware--

MACFARLANE     Okay.

CW-1            --and [inaudible] they're looking at in the-- $400,000 payments that have been made over the years. And so I just wanted you to know that-- that I'm not going to tell the IRS that, you know, the-- the first $200,000 that was paid to get [your daughter] into school through soccer. So I'm not going to say anything about that and I'm not going to say anything about the $200,000 essentially paid to USC for [your son] to get in through-- to Donna Heinel to get in through men's basketball. So I just--

MACFARLANE     Right.

184

CW-1            I just wanted you to know that what-- what I'm-- are you okay with that?

MACFARLANE      That you're not going to tell them that?

CW-1            That is correct.

MACFARLANE      Yeah, and I think that's the-- the proper tact, for sure.

CW-1            Okay.  So what we'll--

MACFARLANE      Do you think-- do you think-- are you expecting me to get some backlash
                on that or--

CW-1            No, don't-- no, right.

MACFARLANE      Okay.

CW-1            [inaudible] there's-- there's hundreds of people involved. Hundreds.

MACFARLANE      Okay.

CW-1            And--

MACFARLANE      Okay.

CW-1            --I'm just trying to connect with folks just to say, "Hey, I-- I-- you know,
                this is what really happened, right?"

MACFARLANE      Yeah.

CW-1            Like [your daughter] got in and [your son] got in and they're really not
                collegian athletes--

MACFARLANE      Yes.

CW-1            --but we-- we made it work through, you know, Donna Heinel in soccer and
                basketball and USC athletics, but I don't want-- I want to make sure that
                you guys don't say anything to contradict what I'm going to say, which is
                that your $400,000 helped-- was funded-- paid to my foundation.

MACFARLANE      Right.

CW-1            And that we help underserved kids and that's why you gave the money.

MACFARLANE      Yeah.  Okay.

185

| CW-1 | And then-- |
|---|---|
| MACFARLANE | Sure.  Yeah, good.  We're on the same page. |
| CW-1 | You okay with that? |
| MACFARLANE | Yeah, completely. |
| CW-1 | Okay. |
| MACFARLANE | I mean, I-- I actually wro-- I wrote it off as-- as a consultant-- a consultant fee but-- |
| CW-1 | Okay. |
| MACFARLANE | Yeah.  But I-- if-- if it doesn't ever, you know, come back that far then it shouldn't be a problem. |
| CW-1 | Right, right. |

## W. STEPHEN SEMPREVIVO

481.    Defendant STEPHEN SEMPREVIVO resides in Los Angeles, California. SEMPREVIVO is an executive at a privately held provider of outsourced sales teams, based in Agoura Hills, California.

482.    As discussed below, SEMPREVIVO agreed to bribe Ernst, the Georgetown tennis coach, to designate his son as a tennis recruit—despite the fact that he did not play tennis competitively—in order to facilitate his admission to Georgetown.

483.    On or about August 19, 2015, CW-1 sent SEMPREVIVO, his spouse and their son an e-mail with the subject line "Dear Coach Ernst."  CW-1 instructed SEMPREVIVO's son: "[P]lease send this note and a PDF of transcripts and test scores to Gordie Ernst Mens' Tennis at Georgetown U from your email-then let me know it is done."  The note drafted by CW-1 and set forth below included fabricated representations about the SEMPREVIVO's son's purported tennis experience and prior contacts with Ernst.

186

Dear Coach Ernst

I wanted to update you on my summer doings. After your suggestion I have played very well with terrific success in Doubles this summer and played quite well in singles too.

I am looking forward to having a chance to play for you. Our conversations have inspired me to try to dominate my competition this summer.

Senior year is about to start and you can count on me to achieve great grades.

Thanks for the chance to play for you and Georgetown University.

484.    SEMPREVIVO's son e-mailed the note to Ernst, as instructed, later that same day, along with his high school transcript and SAT scores.

485.    Ernst forwarded the e-mail the following day to a member of the Georgetown admissions staff, who responded, "looks fine." Ernst then e-mailed the admissions officer to "confirm" that he had used three of his allocated admissions "spots"—one for SEMPREVIVO's son and, unbeknownst to the admissions officer, two for other clients of CW-1—and that he still had three more spots left to fill.

486.    On or about August 26, 2015, CW-1 made the following notation in his e-mail account:  "Semprevivo 400 Gtown."

487.    On or about October 11, 2015, CW-1 e-mailed SEMPREVIVO and his son an "activity" essay for inclusion in his Georgetown application. The subject line of the e-mail stated, "This is the Final for Activity for Gtown ... USE THIS ONE." The essay read, in part: "When I walk into a room, people will normally look up and make a comment about my height – I'm 6'5 – and ask me if I play basketball. With a smile, I nod my head, but also insist that the sport I put my most energy into is tennis."

488.    SEMPREVIVO's son's Georgetown application falsely indicated that he played tennis during all four years of high school and was ranked in singles and doubles tennis. The

application further listed SEMPREVIVO's son as a "CIF Scholar Athlete" and "Academic All American" in tennis and basketball and stated that he made the "Nike Federation All Academic Athletic Team" in tennis. College applications submitted by SEMPREVIVO's son to schools other than Georgetown did not reference tennis. Records obtained from the United States Tennis Association do not include any match records for SEMPREVIVO's' son.

489.    On or about November 6, 2015, Georgetown sent SEMPREVIVO's son a letter noting that "[t]he Committee on Admissions has conducted an initial review of your application to the Class of 2020 at the request of Mr. Gordie Ernst, Tennis Coach" and that "the Committee has ranked your admission as 'likely.'" The letter explained that candidates rated "likely" have a greater than 95 percent chance of being admitted to Georgetown and that SEMPREVIVO's son would receive a final decision by April 1, 2016.

490.    On or about April 22, 2016, after SEMPREVIVO's son was granted formal admission to Georgetown, a KWF employee e-mailed SEMPREVIVO and his spouse an invoice in the amount of $400,000 for their purported "Private Contribution" to KWF. On or about April 28, 2016, the SEMPREVIVO Family Trust issued a check to KWF in the amount of $400,000.

491.    CW-1 made numerous payments to Ernst from the KWF account into which the SEMPREVIVO family made their donation. Between on or about September 11, 2015 and November 30, 2016, CW-1 caused KWF to issue checks to Ernst totaling $950,000, representing payments for the purported recruitment of SEMPREVIVO's son and the children of other clients of CW-1.

492.    SEMPREVIVO's son matriculated at Georgetown on or about the Fall of 2016. Since enrolling at the university, he has not joined the tennis team.

493.    On or about October 25, 2018, CW-1 called SEMPREVIVO's spouse at the

direction of law enforcement agents and told her that KWF was being audited by the IRS. The

following is an excerpt from the call, which was consensually recorded.

CW-1            Well, I wanted to touch bases because I wanted to let you know that-- so
               my foundation is being audited, which is, you know, very typical.

SPOUSE         Uh-huh.

CW-1            Because we have so many families that have made payments to our
               foundation. So I just wanted to make sure that-- they're looking at the
               payments and they looked at your guy-- your family's $400,000 payment,
               that was made for [your son]. So I wanted to make sure that we were on
               the same page as I talk to the IRS.

SPOUSE         Okay.

CW-1            Of course, I'm not go-- I'm not-- I am not going to say anything about--
               that your payment went to help [your son] get into Georgetown, and the
               payment was made to Coach Gordie Ernst and Georgetown tennis and
               obviously [your son] wasn't a tennis player. So I'm not going to talk about
               that at all. What--

SPOUSE         Okay.

CW-1            What-- is that okay?

SPOUSE         Yeah. No, I—yeah. And I think I would want maybe Stephen to talk to
               you as well.

CW-1            Okay. And just so you know, so—essentially what I'm going to tell the
               IRS is that your $400,000 payment was made to our foundation to help,
               you know, serve underserved kids that-- that we do with our foundation.

SPOUSE         Okay. That's-- that sounds good.

CW-1            Right. And that-- and that's what we want, because obviously we're not
               going to say anything about, you know, [your son] going in through
               Gordie Ernst and the payment being made to Gordie and then through
               Georgetown tennis. So I just want to make sure that you and I are, and
               Stephen, are on the same page. You can just--

SPOUSE         Okay.

189

CW-1              --know that I will be stating that the payment was made to our foundation
                 and-- but you may get--somebody may reach out to you. Somebody may
                 not. We have so many families that have-- that have made payments
                 through our foundation. So I wouldn't worry about it at all.

SPOUSE           Okay. Thank you.

CW-1             You're very welcome. I just-- just wanted to make sure that we were on
                 the same page.

SPOUSE           Okay. Stephen might just give you a call but-- but yeah. That seems pretty
                 straightforward.

CW-1             Okay. That's all. I just wanted to touch bases.

SPOUSE           Okay. Okay. Thanks, [CW-1].

    494.    On or about December 3, 2018, CW-1 called STEPHEN SEMPREVIVO at the

direction of law enforcement agents and told him that he wanted to provide an update on the IRS

audit. The following is an excerpt from the conversation, which was consensually recorded.

CW-1             Well, thanks for letting me call you. I-- I talked to [your spouse], but I just
                 want to give you an update. So they've been doing an audit on my
                 foundation.

SEMPREVIVO       Okay.

CW-1             And they've finally now kind of picked—pegged out some stuff. So they
                 keep-- you know, they're going-- I think they may call all the folks that
                 we, helped get into Georgetown.

SEMPREVIVO       Um-hmm.

CW-1             And so I just wanted to make sure that we were all on the same page that--
                 because I'm sure that my-- I don't know if they're going to call you, but it
                 sounds like they're going to call all these folks, because we have probably
                 15, 20 folks over the coup-- last couple of years that have gotten in, and so
                 I essentially-- you know, I've told them my-- I'll tell you what I have not
                 told them. I did not tell them that [your son] was-- that he got in through
                 tennis and that he wasn't a tennis player, but that you guys made a
                 payment to Gordie Ernst in Georgetown tennis. I didn't say that. I just
                 essentially said that [your son] got in through one of my relationships at
                 Georgetown and just left it at that, and that you guys made a donation to
                 our foundation to help underserved kids. And I just used one of my

|  | relationships. And it wasn't anything to do with that he was or wasn't a tennis player, which he wasn't. So I just wanted you to know that in case they call you. |
|---|---|
| SEMPREVIVO | Okay. Yeah. Yeah. You know, however you-- that-- that-- that, you know, we donate to the-- we donated to the, you know, foundation. It does great work and, you know-- and, you know, we appreciate, you know, any help outside of that that-- that we got from you. So, you know-- |
| CW-1 | Perfect. That-- that's all I wanted you to know, so in case they call, because these people that audit-- I'm sure you've been audited before. They-- they're-- they're-- they have no mercy. |
| SEMPREVIVO | Um-hmm. |
| CW-1 | So I just wanted you to be aware, in case you got a call. |
| SEMPREVIVO | Yeah.  Yeah.  They-- and-- and-- and,  my experience has been they like to do stuff in a-- and-- and, you know, send you documents and have you kind of do something in writing and-- and we'll see what happens in terms of them-- |
| CW-1 | Okay. |

495.    On or about March 3, 2019, CW-1 spoke with SEMPREVIVO again at the

direction of law enforcement agents. CW-1 advised SEMPREVIVO that Georgetown was

conducting an internal investigation to determine why students who were not tennis players had

been admitted to Georgetown through Ernst. The following is an excerpt from the call, which

was consensually recorded.

|  |  |
|---|---|
| CW-1 | So, I got a call this morning from the-- my Georgetown people and they said that they were doing an internal investigation because Gordie Ernst, who was the men's and women's tennis coach when [your son] got admitted, they're doing an internal investigation to figure out why all these kids got in that were not tennis players, like [your son]. Right? |
| SEMPREVIVO | Okay. |
| CW-1 | So, I'm-- so I just wanted you to know. I don't know what the impact will be or anything but it's just internal and it's all about, "So why didn't, you know, all these kids, like [your son], who weren't tennis players, didn't come out for the team and where are they now and what's going on." So, |

>since he wasn't a tennis player they're looking at, you know, all the kids
>that just didn't come out and I just didn't-- want to make sure you knew,
>because he wasn't a tennis player that-- I don't know if anything will
>come out of it. But just-- I wanted you to be aware of it that, that's what,
>that's what they're looking at internally.

SEMPREVIVO          Okay.

496.      SEMPREVIVO then asked CW-1 questions about the Georgetown investigation

and the IRS audit of KWF. With respect to Georgetown's internal investigation, SEMPREVIVO

asked CW-1 if he knew "how many kids they're investigating" and whether the university would

be contacting SEMPREVIVO's son directly. When CW-1 again noted that SEMPREVIVO's son

was not a tennis player, SEMPREVIVO responded: "I'm just gonna, I'm just gonna, um, you

know I think that [inaudible]." At that point, the call disconnected.

497.      SEMPREVIVO called CW-1 back moments later and said that he did not feel

comfortable continuing the discussion. He said: "Hey, [CW-1], I, you know I don-- you know,

whatever you do, you do. You know? I really don't feel comfortable talking to you about this

stuff in terms of, kind of, you know, in terms of, in terms of, kind of your-- your, you know, your

dealings." SEMPREVIVO then denied knowing that his son was admitted to Georgetown

through Ernst. The following is an excerpt from the conversation.

| | |
|---|---|
| SEMPREVIVO | You know, all I know is that we, you know, we used you for the charity stuff and we used you for the counseling, and your dealings are your dealings. And so, you know. |
| CW-1 | No I get that. And I understand that, but at the same time we were all a part of-- |
| SEMPREVIVO | No, I don't agree with that at all. You-- |
| CW-1 | You don't agree that we got him in through tennis and you didn't know that [inaudible]? |
| SEMPREVIVO | I don't. I don't. I do-- you know, you did what you did, [CW-1], and that was your stuff. Okay? So-- |

CW-1                 Okay.

SEMPREVIVO           --I think, I think that that's how, you know, you did what you did and so
                     I'm not going to take accountability for your actions and I think that, you
                     know, you need to be accountable for [inaudible]--

CW-1                 And I'm-- absolutely. I'm totally accountable that I got him in through
                     tennis and that you guys were aware of it, but I'm totally aware of it and
                     I'm totally-- accept the responsibility that I used my relationship and made
                     [your son] a tennis player. And we all agreed that that's what we were
                     going to do.

SEMPREVIVO           You know, I don't have any details, but I think that, I think that you need
                     to be accountable for what you did. So I don't want to talk about this any
                     more because, you know, I think there were two separate things. And, we
                     used you and we donated. We donated as a charity, and it was a good
                     charity and we were excited we could help you and, you know, in terms
                     of, you know, how you do favors for people separately that's, you know,
                     I-- we appreciate any help you gave us. But, you know, we used you in
                     terms of the, you know, in terms of your college stuff. We paid you well
                     for the, you know, for the work you did there separately. So, and we
                     appreciate it. So, I think that, you know, if you're trying to turn something
                     around in terms of, you know, what you did and how you did it then I
                     don't want to be, I don't want to be a part of that.

## X.  GREGORY COLBURN and AMY COLBURN

498.    Defendants GREGORY COLBURN and AMY COLBURN, a married couple

(together, "the COLBURNS"), are residents of Palo Alto, California.  GREGORY COLBURN is

a physician.

499.    As set forth below, the COLBURNS participated in the college entrance exam

cheating scheme on behalf of their son.

500.    On or about October 10, 2017, AMY COLBURN e-mailed CW-1 that she was

still waiting to hear back about her son's testing accommodation from the College Board.  On or

about December 31, 2017, CW-1 e-mailed AMY COLBURN an SAT admission ticket for the

COLBURNS' son for an exam with extended time on March 10, 2018.

501.    In or about mid-December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of $24,443.50. On or about December 30, 2017, GREGORY COLBURN issued a check in the amount of $547.45 to KWF. In the memo line of the check, GREGORY COLBURN wrote "charitable donation."

502.    On or about December 29, 2017, KWF issued a letter to GREGORY COLBURN falsely indicating that "no goods or services were exchanged" for his purported donation of $25,000.

503.    On or about February 1, 2018, Dvorskiy submitted paperwork to the College Board to change the location of the March 10 test site from the COLBURNS' son's high school in Palo Alto to the West Hollywood Test Center.

504.    On or about March 9, 2018, CW-2 flew from Tampa to Los Angeles. On or about March 10, 2018, the COLBURNS' son took the SAT at the West Hollywood Test Center with CW-2 as the purported proctor. CW-2 returned to Tampa on or about March 11, 2018.

505.    CW-1 caused KWF to issue payments of $20,000 each to Dvorskiy, on or about March 14, 2018, and to CW-2, on or about March 23, 2018, for their roles in executing the SAT cheating scheme for the COLBURNS' son and another student who took the exam that same day.

506.    On or about October 24, 2018, CW-1 called the COLBURNS at the direction of law enforcement agents and told them the IRS was auditing KWF. Initially, CW-1 spoke only with AMY COLBURN. The following is an excerpt from the call, which was consensually recorded.

CW-1            Okay. So, so, you know, essentially, they asked me about your payments for [your son] taking the test, with [CW-2] at [the West Hollywood Test Center].

| | |
|---|---|
| A. COLBURN | Okay. Is that a problem? |
| CW-1 | No. So I just, I just want to-- of course, I'm not going to mention to the IRS that [CW-2] took the test for [your son]. |
| A. COLBURN | Mm-hmm. |
| CW-1 | So, so what I've stated to the IRS, [is] that your payment went to our foundation to help underserved kids. |
| A. COLBURN | Okay. |

507.   AMY COLBURN then put GREGORY COLBURN on the phone. The following is an excerpt from the conversation.

| | |
|---|---|
| CW-1 | So what I'm telling the IRS is that-- I'm not-- well, let me say this. What I'm not telling the IRS is that [your son]-- that [CW-2] [inaudible] took the test for [your son] at [the West Hollywood Test Center]. |
| G. COLBURN | No, I got that. Yes. No, I got that. |
| CW-1 | All right. But what I am telling them is that your payment essentially went to our foundation to help underserved kids. |
| G. COLBURN | Right. Okay. |
| CW-1 | So I just want to make sure that our stories -- |
| G. COLBURN | Yes. |
| CW-1 | --are aligned. |
| G. COLBURN | Yes. I said that no goods and services were exchanged for this. Yeah. I, I, I-- that's correct. |
| CW-1 | Okay. All right. So that's really what I wanted to make sure, was that we're both on the same page. |
| G. COLBURN | Good. |
| CW-1 | Excuse me. And just in case they were to call you, I just wanted to-- because I've already told them that, you know, this-- essentially, this payment was made to our foundation in lieu of, but we both know that, [CW-2] took the test for [your son]. But I just wanted to make sure that we don't-- we're all on the same page. |

G. COLBURN          Right. It was to help underserved kids.

CW-1                Correct.

G. COLBURN          Got it. No problem.

     Y. ROBERT FLAXMAN

508.    Defendant ROBERT FLAXMAN is a resident of Beverly Hills, California.
FLAXMAN is the president and CEO of a Los Angeles-based real estate development firm.

509.    As set forth below, in or about 2016, FLAXMAN participated in both the college
recruitment scheme and the college entrance exam scheme.

510.    On or about October 25, 2015, CW-1 e-mailed FLAXMAN's son's ACT scores
and transcript to Martin Fox, who forwarded the materials to a varsity coach at the University of
San Diego ("USD"). On or about October 26, 2015, CW-1 e-mailed FLAXMAN that he "spoke
to USD and they received [your son's] info. They are interested in helping."

511.    On or about November 2, 2015, FLAXMAN e-mailed CW-1 asking for an update
on the status of his son's admission to USD. CW-1 replied: "The coach I am working with has
not gotten his scheduled appointment with Admissions for all of his recruitable athletes. He is
on board to help and has [your son's] materials. I am sure I will receive a call on next steps
soon." On or about November 12, 2015, a USD admissions counselor e-mailed the varsity coach
a memorandum giving the coach approval to sign FLAXMAN's son to the coach's team.

512.    On or about November 16, 2015, CW-1 e-mailed FLAXMAN and his son. The
subject line of the e-mail was: "Here is what I came up with that touches on a lot of who you are
and what I put on your application." The essay, and the application ultimately submitted to
USD, referenced FLAXMAN's son's purported volunteer work as the manager of an elite youth
athletic team. Prior essay drafts contained no references to that sport.

513. USD formally admitted FLAXMAN's son on or about March 7, 2016.

514. On or about April 22, 2016, a KWF employee e-mailed FLAXMAN an invoice in the amount of $250,000. The cover e-mail described the invoice as a "courtesy reminder of the pledge made to [KWF]." On or about May 9, 2016, the KWF employee e-mailed FLAXMAN again: "Hi Bob, We have some obligations that we must meet. When can we count on your payment?" FLAXMAN replied that he "was supposed to receive [a] revised request that included 501(c)3 info for tax purposes. I would like to make two payments. One now and one end of June."

515. FLAXMAN's company wired two payments of $125,000 each to KWF on or about May 13, 2016 and June 23, 2016.

516. On or about June 6, 2016, CW-1 caused KWF to issue a payment of $100,000 to Fox. Fox advised CW-1 that he, in turn, paid the USD coach for facilitating FLAXMAN's son's admission.

517. In or about April 2016, FLAXMAN's daughter took the ACT and received a score of 20 out of a possible 36. On or about September 12, 2016, FLAXMAN e-mailed CW-1 that his daughter took the "ACT this weekend and thought she did better than the last time. She actually finished the exam." FLAXMAN's daughter received a score of 24 on the September test.

518. On or about October 4, 2016, CW-1 e-mailed FLAXMAN that his contact at ACT "has the paperwork and will put [your daughter] into [the Houston Test Center] for Oct." FLAXMAN replied: "Ok. I will need details soon. Address. Who and where to check in and what instructions we need to give [my daughter] to use at the test." On or about October 6, 2016,

CW-1 e-mailed FLAXMAN the address of the Houston Test Center and contact information for Niki Williams, the test center administrator.

519.    On or about October 15, 2016, CW-1 directed a KWF employee to send invoices to FLAXMAN and another client in the amount of $75,000 each. CW-1 further instructed the employee to send $50,000 to Fox and $20,000 to CW-2. CW-1 has advised law enforcement agents that the payments were for Fox's facilitation of CW-1's relationship with Williams, as well as for CW-2's purported proctoring of the exam for FLAXMAN's daughter and the child of CW-1's other client.

520.    On or about October 20, 2016, FLAXMAN's company wired $75,000 to KWF. On or about October 21, 2016, a KWF employee sent FLAXMAN a letter falsely attesting that "no goods or services were exchanged" for the purported contribution.

521.    CW-2 flew from Tampa to Houston on or about October 21, 2016. On or about October 22, 2016, FLAXMAN's daughter and the child of another client of CW-1 both took the ACT at the Houston Test Center. CW-2 has advised investigators that he assisted FLAXMAN's daughter and the other student to answer questions on the exam, and instructed them to answer different questions incorrectly so that they did not have the same incorrect answers on their tests, and the ACT would therefore not suspect cheating. CW-2 returned to Tampa the next day.

522.    FLAXMAN's daughter received a score of 28 on the ACT exam.

523.    On or about October 23, 2018, CW-1 called FLAXMAN at the direction of law enforcement agents and told him that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

CW-1            Okay-- so our-- so our books show there was a $250,000 payment for [your son's] side door into USD, through [the USD varsity coach] and [the varsity sport]--

| | |
|---|---|
| FLAXMAN | Yeah. |
| CW-1 | --and there was a 75K payment for [CW-2] to take-- |
| FLAXMAN | Yeah. |
| CW-1 | --the standardized testing, SAT, ACT, with [your daughter]. |
| FLAXMAN | Yeah. |
| CW-1 | Okay. So we're both on the same page. |
| FLAXMAN | An-an-and the-- the reason for the payments is what? |
| CW-1 | The reason for the payments were to, essentially-- We won't say that it went to pay for [your son] to get into USD. We'll say that the payments were made to our foundation to help kids-- underserved kids. |
| FLAXMAN | Okay. That's fine. |

### Z. HOMAYOUN ZADEH

524.    Defendant HOMAYOUN ZADEH is a resident of Calabasas, California. ZADEH is an associate professor of dentistry.

525.    As set forth below, ZADEH conspired to bribe Heinel to designate his daughter as a lacrosse recruit—despite the fact that she did not play lacrosse competitively—thereby facilitating her admission to USC.

526.    In an e-mail on or about December 8, 2016, ZADEH instructed his daughter's tutor to forward his daughter's "unofficial transcripts and SAT scores" to CW-1. The tutor sent the materials to CW-1, who forwarded them to Janke, writing, "Picture to follow for USC."

527.    In an e-mail on or about December 16, 2016, ZADEH provided CW-1 with a photograph of his daughter cheerleading. CW-1 forwarded the photograph to Janke, writing, "Laura any way to build the profile for [ZADEH's daughter] playing lacrosse – I told Donna [Heinel] it would come soon."

528.   Janke created a lacrosse profile for ZADEH's daughter, and CW-1 forwarded the profile to Heinel on or about December 23, 2016. The profile falsely described ZADEH's daughter as being an elite player on two club lacrosse teams in the Los Angeles area. Heinel then created a separate lacrosse profile for ZADEH's daughter, on USC letterhead, which falsely stated that ZADEH's daughter was "one of the top defenders within the youth club development league," and was a "player who knows how to work as a team in order to win," and included fabricated comments that Heinel included to appear as though they were from the USC lacrosse coach.

529.   Heinel presented ZADEH's daughter to the USC subcommittee for athletic admissions as a purported lacrosse recruit on or about March 15, 2017.

530.   In a lengthy text message exchange that began on or about March 20, 2017, ZADEH discussed the admission of his daughter to USC with CW-1. In the conversation, CW-1 requested that ZADEH confirm that his daughter would attend USC. CW-1 told ZADEH that he "must act quickly." ZADEH replied that his daughter had become "extremely upset as to why I am pressuring her to make a decision on the spot." ZADEH wanted "a little time so that [he could] approach [his] daughter in a way that is more conducive. I really appreciate what you have done." CW-1 responded: "I can ask tomorrow but my guess is the answer will be no. Since the funds have been transmitted I need to cover myself. If they say no then I need to pull the trigger then." ZADEH replied that his daughter was concerned that "she did not get in on her own merits. I have not shared anything about our arrangement but she somehow senses it. She's concerned that others may view her differently." CW-1 and ZADEH then had the following exchange:

ZADEH            I will go with our arrangement. However I don't have $100k of cash. You
                 had previously told me that half was now to USC and I was going to put

200

on card and you said half wa[s] in the fall. In our phone conversation, you mentioned that I can pay you over 6 months. If so. I can provide you each month a check

CW-1      Thank you for your response ... as for payment- the money will be deposited in the next day or two. My foundation sent the money as requested.[22] Normally the first 50k is sent immediately after acceptance and before the final letter is received. Then the next portion is sent soon after the final letter is provided. Since both are happening on top of each other I sent the monies to my contact as a donation so there is no conflict internally because you are designated as a giver through another department but that was not the group who helped. The group helping wants the credit and funds so it is cleaner through me. Yes I agree that you can make the 100k payment over the next 6 months starting April 1st. You can send to my foundation as a donation/write off or if you have your own company we can invoice you as a business consulting fee from our profit business and you write off as an expense. If you want to complete the transaction by credit card that is fine too. I just need you to designate, which path do you want to be invoiced. Please let me know? Final acceptance will come in the next 10 days or so.

ZADEH responded that he would consult with his CPA "to see which path is preferable."

531.     On or about April 5, 2017, a KWF employee e-mailed an invoice to ZADEH and his spouse for their purported "pledge" of $100,000, noting that the payments would "be made in six equal installments beginning immediately." ZADEH's spouse replied to the e-mail, copying ZADEH, and stated that she and ZADEH were "in the process of refinancing our house to take some of the equity out in order to make these payments." She continued that "April is a difficult month between property taxes and personal taxes," and offered to put $5,000 on her credit card because she did not want CW-1 "to think we are not fulfilling our end of the agreement."

---

[22] USC records reflect that KWF made a $50,000 contribution to the Women's Athletics Board on or about March 27, 2017.

532.   On or about October 5, 2017, ZADEH's spouse e-mailed the KWF employee, copying ZADEH, that the refinancing had been completed, but noting that "Homa should have never agreed to pay you back in 6 months."

533.   Between May 30, 2017 and September 7, 2018, ZADEH made the following payments to KWF:

| Date Posted to KWF Account | Amount |
|---|---|
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

534.   On or about December 27, 2017, KWF issued a letter to ZADEH and his spouse falsely attesting that "no goods or services were exchanged" for their donations.[23]

535.   In a call on or about October 25, 2018, CW-1, at the direction of law enforcement agents, told ZADEH that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So my foundation is being audited now, which is typical of all the foundations which have lots-- lots of action. |
| ZADEH | Sure. Sure. |
| CW-1 | And so what I wanted to make sure is that when [inaudible] they asked about your guys' payment-- |
| ZADEH | Right. |

---

[23] On or about March 6, 2019, ZADEH's spouse e-mailed CW-1, copying ZADEH, noting that she had sent an additional $5,000 to KWF. ZADEH's spouse asked for a tax receipt for the $25,000 that was "donated in 2018."

CW-1            --so I just want to make sure that obviously I'm not going to tell the IRS that we got [your daughter] in through--

ZADEH           Right.

CW-1            --lacrosse--

ZADEH           Right.

CW-1            --and Donna Heinel at USC.

ZADEH           Right.

CW-1            Right?

ZADEH           Right.

CW-1            And, you know, we created a profile that wasn't real.

ZADEH           Right.

CW-1            Right?  For lacrosse.  I just want to make sure that we're on the same page that we're not going to say that.  What we are going to say is that your donation is going to my foundation which essentially--

ZADEH           Yeah.

CW-1            --is helping underserved kids.

ZADEH           Right.

CW-1            You good with that?

ZADEH           Okay, yeah.

CONCLUSION

536.    Based on my knowledge, training and experience, and the facts set forth in this

affidavit, I respectfully submit that there is probable cause to believe that the defendants

conspired to commit mail fraud and honest services mail fraud, in violation of Title 18, United

States Code, Section 1349.

Respectfully submitted,

Laura Smith
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on March 11th, 2019

The Honorable M. Page Kelley
United States Magistrate Judge

204